# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### November 14, 2012 Session

## CHRIST CHURCH PENTECOSTAL v. TENNESSEE STATE BOARD OF EQUALIZATION, ET AL.

**Direct Appeal from the Chancery Court for Davidson County**
**No. 11-50-II      Carol L. McCoy, Chancellor**

---

**No. M2012-00625-COA-R3-CV - Filed March 21, 2013**

---

This lawsuit concerns the extent to which a bookstore/café area and fitness center/gymnasium contained in a church family life center facility are exempt from property taxation under Tennessee Code Annotated § 67-5-212. The trial court upheld the determination of the State Board of Equalization and the Assessment Appeals Commission that the bookstore/café area was not exempt from taxation, and that the fitness center qualified for a 50 percent exemption under the statute. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which HOLLY M. KIRBY, J., and J. STEVEN STAFFORD, J., joined.

Kevin Theriot and Erik Stanley, Leawood, Kansas, and Frank Ingraham and Robert Pautienus, Brentwood, Tennessee, for the appellant, Christ Church Pentecostal.

Robert E. Cooper, Jr., Attorney General and Reporter, William E. Young, Solicitor General, Mary Ellen Knack, Senior Counsel, for the appellees, Tennessee State Board of Equalization, Tennessee Assessment Appeals Commission and Robert E. Cooper, Jr., in his official capacity as Attorney General and Reporter for the State of Tennessee.

Saul Solomon, Lora Barkenbus and Emily Herring Lamb, Nashville, Tennessee, for the Metropolitan Government of Nashville and Davidson County.

**OPINION**

This case concerns Taxpayer church's appeal of property taxes assessed on approximately seven percent of its real property for the 2004-2008 tax years. Plaintiff/Appellant Christ Church Pentecostal ("CCP") has been located in Nashville since 1949, and was chartered as a nonprofit corporation in 1979. CCP is not affiliated with any denominational body, but is an independent church. In the mid 1970s, it moved to Old Hickory Boulevard, between the Brentwood and Antioch areas, where it now owns approximately forty acres of real property and several buildings. The estimated value of the real property owned by CCP was $2,057,227 in 2004, and its structures were valued at $15,000,000. CCP now has several thousand members.

In 2004, CCP completed construction of a multi-million dollar building known as the Hardwick Family Life Center ("the family life center"or "the center'). The center encompasses approximately 104,000 square feet on four levels. It contains space for worship and fellowship; classrooms; offices; an indoor playground, the "For His Glory" bookstore/café area; and the Hardwick Activity Center ("HAC"), which includes a fitness center and gymnasium. The entrance to the family life center is separate from the main sanctuary. The bookstore and adjoining café are on level 1 of the center, and HAC complex is on level 3.

In November 2004, CCP filed an application for property tax exemption pursuant to Tennessee Code Annotated § 67-5-212. Following a site visit in January 2007, a staff attorney for the State Board of Equalization ("the Board") made an initial determination that most of the new building was tax-exempt, but denied the exemption for the portion of the building containing the bookstore/café area and the fitness center/gymnasium on the grounds that they were retail/commercial in nature and not used for religious purposes.

In July 2007, CCP filed an untimely appeal to the Board. On August 2, CCP filed a motion for extraordinary relief pursuant to Rule 60.02 of the Tennessee Rules of Civil Procedure, asserting its failure to file a timely appeal was the result of mistake, inadvertence and excusable neglect. The Board heard the motion as permitted by Tennessee Code Annotated § 67-5-1412(e), granted relief by order entered January 13, 2009, and referred the matter for a hearing on the merits before an administrative judge.

The matter was heard by an administrative law judge ("ALJ") on August 19, 2009. By order entered November 20, 2009, the ALJ affirmed the denial of the exemption for the bookstore/café area. It granted a 50 percent exemption for the fitness center area on the basis that it was used for CCP's youth recreational activities in addition to general public use on a membership fee basis. CCP appealed that determination to the Assessment Appeals

Commission ("the Commission"), which heard the matter on August 5, 2009. By order entered October 8, 2010, the Commission affirmed the Board's determination.[1] The Commission issued its official certificate on November 23, 2010.

On January 12, 2011, CCP filed a petition for review pursuant to Tennessee Code Annotated § 4-5-322 in the Chancery Court for Davidson County. In its petition, CCP asserted that the evidence submitted to the ALJ and the Commission demonstrated that the bookstore/café and fitness center portions of the family life center were integral or directly related to one or more of its religious purposes; that the Commission's decision violated Tennessee's Religious Freedom Restoration Act; and that the Commission's decision violated the Establishment Clause where it made a doctrinal determination as to the religious purposes of CCP. CCP also asserted that the Commission's determination violated the Equal Protection Clause where 1) CCP was required to demonstrate that the facilities were used purely and exclusively for religious purposes while other charities, including community centers and performing centers are required to prove only that their facilities are used for uses necessary and incidental to the purpose of the organization and 2) where family wellness centers and college and university bookstores are exempt from taxation. Following a hearing of the matter on September 2, 2011, the trial court affirmed the Commission's decision by order entered February 23, 2012. In its order, the trial court thoroughly analyzed the issues raised by CCP, the relevant and largely undisputed facts, and the applicable case law, and determined that CCP had failed to meet its burden to demonstrate that the Board's decision was in error. The trial court determined that CCP was not entitled to an exemption from taxation for those portions of its property that were used to conduct retail/commercial business. CCP filed a timely notice of appeal to this Court.

### Issues Presented

CCP presents the following issues for our review, as stated in its brief:

(1)     Christ Church is entitled to a tax exemption because it established that its facilities are used purely and exclusively for carrying out the purposes of the church.

(2)     Denying Christ Church a tax exemption for its facilities violates the Establishment Clause of the First Amendment to the Unites States

---

[1]The Administrative Record contains correspondence from CCP's legal counsel to the Davidson County Assessor of Property stating that the bookstore and café were last operated on June 26, 2010, and that the space had been converted into a meeting space and classrooms. Counsel further stated that the YMCA had assumed possession of the gym pursuant to a space use agreement dated July 14, 2010.

-3-

Constitution because it excessively entangles the State in church doctrine.

(3)     Denying Christ Church a tax exemption but statutorily granting similarly-situated entities a tax exemption violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because it treats similarly-situated entities differently without a sufficient basis for the differential treatment.

(4)     The Tennessee tax exemption statutes violate the Free Exercise Clause of the First Amendment to the United States Constitution because they are not neutral or generally applicable laws and because they substantially burden the Church's free exercise of religion.

(5)     The Tennessee exemption statutes violate Tennessee's Religious Freedom Restoration Act.

### *Standard of Review*

The Administrative Procedures Act governs our review of this matter. Tenn. Code Ann. § 67-5-212(b)(4)(2011). The Act provides, in pertinent part:

The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
      (1) In violation of constitutional or statutory provisions;
      (2) In excess of the statutory authority of the agency;
      (3) Made upon unlawful procedure;
      (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
      (5)(A) Unsupported by evidence which is both substantial and material in the light of the entire record.

Tenn. Code Ann. § 4-5-322(h)(1998). Review of an agency's findings of fact is limited to the record of the case. Tenn. Code Ann. § 4-5-322(g)(1998); *e.g., Youth Programs, Inc. v. Tennessee State Bd. of Equalization*, 170 S.W.3d 92, 96 (Tenn. Ct. App. 2004). When determining the substantiality of the evidence, however, the court must take into account whatever in the record fairly detracts from its weight, but may not substitute its judgment for

the judgment of the agency as to the weight of the evidence on questions of fact. Tenn. Code Ann. § 4-5-344(h)(5)(B). The application of the law to the facts, however, is a question of law for the courts. *Youth Programs*, 170 S.W.3d at 96 (citation omitted). Whether "the purpose for which property is used qualifies the property as exempt from taxation under the statutes" also presents a question of law for the courts. *Id.* (citing *Book Agents of the Methodist Episcopal Church, S. v. State Bd. of Equalization*, 513 S.W.2d 514, 521 (Tenn.1974)(citing *Oak Ridge Hosp. v. City of Oak Ridge*, 57 Tenn. App. 487, 420 S.W.2d 583 (1967))).

### *Discussion*

The "fundamental rule that all property shall be taxed and bear its just share of the cost of government, and no property shall escape this common burden, unless it has been duly exempted by organic or statute law" is a well-settled constitutional mandate in Tennessee. *Book Agents of the Methodist Episcopal Church, S. v. State Bd. of Equalization*, 513 S.W.2d 514, 521 (Tenn 1974). It is also well-settled that the General Assembly may not grant tax exemptions that are "contrary to the express mandate of" Article II, Section 28, of the Tennessee Constitution. *Metropolitan Gov't of Nashville and Davidson County v. Tennessee State Bd. of Equalization*, 817 S.W.2d 953, 956 (Tenn. 1991)(quoting *Cumberland Univ. v. Galladay*, 152 Tenn. 82, 86, 274 S.W. 536 (1924)). "The requirement of the constitution is imperative that all property except that mentioned shall be taxed." *Id*. (quoting *id*.)

Pursuant to the authority granted to it by the Tennessee Constitution, the General Assembly has exempted from taxation properties that are owned and occupied by religious, charitable, scientific or nonprofit educational institutions and used by them purely and exclusively for carrying out one or more of the purposes for which the institution was created and exists. Tenn. Code Ann. § 67-5-212. Section 67-5-212 as it existed during the 2004-2008 tax periods is applicable to the current case. The section provided:

> no property shall be totally exempted, nor shall any portion thereof be pro rata exempted, unless such property or portion thereof is actually used purely and exclusively for religious, charitable, scientific or educational purposes.

Tenn. Code. Ann. § 67-5-212(a)(1)(A)(2003).[2] Unlike similar exemptions granted in other

---

[2]The Code currently provides:

The real property of any such institution not so used exclusively for carrying out thereupon one (1) or more of such purposes, but leased or otherwise used for other purposes, whether

(continued...)

states, the exemption granted by the Tennessee statute is construed liberally in favor of the religious, charitable, scientific or educational institution. *Book Agents*, 513 S.W.2d at 521 (citations omitted). Nevertheless, the one "claiming such exemption has the burden of showing his right to it." *Id.* The purposes of the exemption must be balanced against "the need for an equitable distribution of the tax burden." *Middle Tenn. Med. Ctr. v. Assessment Appeals Comm'n*, No. 01A01-9307-CH-00324, 1994 WL 32584, at \*2 (Tenn. Ct. App. Feb. 4, 1994), *perm. app. denied* (Tenn. May 9, 1994).

In this case, it is undisputed that CCP is a religious institution and that the majority of its property has been determined to be exempt from taxation under Tennessee Code Annotated § 67-5-212. Appellees, the Board, the Commission, the Davidson County Assessor of Property ("the County"), and the Attorney General (collectively, "the State"), however, assert that a small percentage of CCP's property was not entitled to an exemption for the tax years 2004-2008 because that property was not used for exempt purposes. The State asserts that the trial court did not err by affirming the Board's determination that the physical fitness center/gymnasium was entitled to a fifty percent exemption where it was used for a commercial, public use in addition to church-oriented uses, and that the cafe/bookstore area was not entitled to an exemption where it was used for retail purposes. CCP, on the other hand, asserts that the entire property was used purely and exclusively for carrying out its religious purposes. CCP further asserts that the State's determination that CCP's use of the property was not directly related to CCP's religious purpose impermissibly entangles the State in matters of church doctrine because it seeks to define or limit "religious use" in violation of the Establishment Clause of the First Amendment. CCP also asserts that denial of the tax exemption in full violates the Free Exercise Clause of the United States Constitution; that it violates the Equal Protection Clause; and the decision violates the Tennessee Religious Freedom Restoration Act. We turn first to the parameters of the exemption set forth in Tennessee Code Annotated § 67-5-212.

### *Exclusive Use Requirement*

We begin our discussion of this issue by noting that the lower tribunals' particularized

---

[2](...continued)
the income received therefrom be used for one (1) or more of such purposes or not, shall not be exempt; but, if a portion only of any lot or building of any such institution is used purely and exclusively for carrying out thereupon one (1) or more of such purposes of such institution, then such lot or building shall be so exempt only to the extent of the value of the portion so used, and the remaining or other portion shall be subject to taxation.

Tenn. Code Ann. § 67-5-212(A)(3)(B)(2011).

factual findings with respect to the bookstore/café and fitness center/gymnasium are not disputed. The gravamen of this dispute is whether the manner in which the property was used qualifies it as exempt under the "exclusive use" requirement contained in the statute. In this case, CCP asserts the areas were used in ways that were directly incidental to or an integral part of its religious purpose and mission. It asserts in its brief to this Court that the mission of the entire family life center, including the bookstore/café and fitness center, was "to reach out to the community and minister to their needs; something that is a direct purpose of the Church." It states that "there is no use of the café/bookstore or fitness center that was not integral to this primary purpose of outreach, evangelism, and ministry[,]" and that the areas were not profit-making entities. It contends that the trial court accordingly erred by affirming the Board's determination that the bookstore/café area did not qualify as exempt under Tennessee Code Annotated 67-5-212, and that the fitness center/gymnasium was entitled only to a partial exemption.[3]

The State, on the other hand, asserts that the evidence demonstrates that the facilities essentially were retail, commercial facilities. The State asserts that whether CCP made a profit from its use of the facilities is immaterial. It submits that CCP failed to demonstrate that the operation of the facilities was reasonably necessary for the fulfillment of a recognized function of CCP, or that the facilities were directly incidental to or an integral part of CCP's mission of sharing the Gospel with the community. The County additionally asserts that the statute does not exempt property used for "religious outreach" activities, particularly when those activities are "intertwined with commercial activity." With these arguments in mind, we turn to the factual findings of the lower tribunals.

In its initial determination letter, the Board's staff attorney determined that the bookstore/café was "without a doubt a retail business that is open to the general public throughout the week." It stated that "[b]ecause of the church's sincere desire and earnest efforts to use this retail business to help achieve its religious outreach objectives, this retail business competes with similar tax-paying businesses." It determined that the cafe/bookstore was not unlike for-profit chain bookstores that offered extensive sections on religion and offered many of the titles offered by CCP. The initial determination letter stated that the bookstore/café was "far different" from the occasional *de minimis* use of church property for fundraising events, distribution of religious materials, and church gatherings. It found that the bookstore/café was "a permanent, full-scale retail business enterprise, complete with paid employees, cash registers, and book, music, teen wardrobe accessory, greeting card, and gift

---

[3]CCP does not assert that it was entitled to a partial exemption for the bookstore/café area, but asserts the entire Family Life Center qualified as fully exempt. Thus, we do not address whether the bookstore/café area qualified for a partial exemption here. Similarly, the State does not appeal the fifty percent exemption extended to the fitness center/gymnasium area.

displays;" that it was "open throughout the week; and it actively seeks to bring in customers from the general public." The initial determination letter noted that the bookstore/café area was considered to be a collective area due to an integrated layout similar to that of bookstores found in shopping malls, and that the café was accessed by "walking through the bookstore/gift shop, past the bookstore/gift shop cash register and past the wide selection of books, gifts, music, and other inventory." It concluded that the area could only be characterized as a retail business enterprise.

The ALJ found that the "For His Glory" bookstore contained in the family life center sold "a variety of gifts, greeting cards, periodicals, sermon tapes, and music recordings as well as books." The ALJ further found that the book inventory included cookbooks and works of fiction, in addition to sections devoted to "pastor recommendations." The ALJ determined that sales were "guided by the manufacturers' suggested retail prices," but that merchandise had also been discounted or occasionally given away to "financially strapped customers." The ALJ also found that the bookstore was managed by the Pastor's granddaughter, who was a salaried employee, and that she was assisted by two part-time, hourly-paid workers and volunteers. The ALJ noted testimony that the store also provided "a casual setting for Bible studies, staff meetings, and other Church-related events." The ALJ found that the café sold coffee and other non-alcoholic beverages and that its staff includes part-time employees in addition to volunteers. Additionally, the ALJ found that the café was equipped with a big-screen television which allowed patrons to view simulcasts of the worship services as well as televised sports events and other programs.

The Commission added several additional findings to those made by the ALJ. The Commission found that, although a CCP pastor testified that the café differed from book tables and communal coffee services traditionally offered to worshipers "only in the matter of scale," CCP had "taken these devices to a new level, with cash registers, inventory control, and pricing at or near retail." The Commission found that, despite testimony with respect to the lack of public visibility of the café and use of the café area as a meeting place "where counseling could be offered, new and deeper friendships formed and newcomers could 'try' church outside the intimidating sanctity of the worship hall[,]" CCP had not presented sufficient evidence to overturn the Board's decision that the bookstore/café area was not used for a religious purpose.

The trial court, in turn, made additional findings, including that the book inventory of the bookstore/café included, in addition to "Pastor Recommendations" and recorded sermons, sections devoted to women's interests; cooking, health and diet; teen interests; classics; and fiction. The trial court also found that, in addition to books, the store sold artwork, periodicals, bumper-stickers, greeting cards, gift items, music recordings, and "impulse purchase items at the cash register." The trial court found that CCP did not advertise or

promote the bookstore through television or newspaper advertisements, but relied on word-of-mouth and its website. It found that the café was supplied by vendors including Sysco and Bongo Java, and that it held a display case and price list for muffins and other food items. Like the ALJ and the Commission, the trial court noted testimony that the café area was used by "many church activity groups, as well as other customers[.]" It also noted testimony that its "informal atmosphere was conducive to the family counseling" and that CCP pastors sometimes administered counseling there.

With respect to the fitness center, the Board's initial determination letter stated that the fitness center was "without a doubt a business operation that is open to the general public throughout the week." It stated that it "[could] not be disputed that [CCP] [had] made great effort to capture business from the outside, whether through commercial advertisement, word-of-mouth, or otherwise." It further noted that approximately one-half the fitness center's 800 members were not CCP members and that, with the exception of a children's sports camp program, the fitness center could not be used without a paid membership or guest fee. It observed that membership fees had increased to $100 per year for church members as well as non-members, that an individual visit fee was $4.00, and that this pricing was "extremely competitive." The initial determination letter also referenced for-profit training businesses offering paid adult classes in the facility and use of the facility by paid sports leagues.

Upon review, the ALJ found that the fitness center was managed by a full-time CCP employee, who also served as Director of CCP's Men's Ministry. The ALJ further found that, although the HAC was open seven days a week, access to the fitness center was restricted to members on Tuesdays, Thursdays, and Saturdays. It further found that the membership fee was $100 per individual and $175 for families; and that a one-day guest pass was available when the facility was open to the public. The ALJ found that "scholarships" were available and noted testimony that no one was turned away because of inability to pay. The ALJ found that the HAC included a gymnasium, indoor track, fitness center, and dance room; that a hip-hop dance troupe met once a week in the dance room; that the gymnasium had become a popular teen hangout; and that paid classes were offered in ballet, Pilates, kickboxing, and other activities under fee-splitting arrangements with the instructors. It also found that the gymnasium was used as the site for Upward Basketball, a faith-based program in which several hundred children participated, and was used to accommodate overflow crowds at large-scale church-related events, including Easter services. The ALJ noted testimony by CCP pastors that, like the bookstore/café area, the HAC was a safe non-threatening "third space" which could facilitate attracting new members to the church. The ALJ determined that the facility was entitled to a 50 percent exemption based on use of the gymnasium for Upward Basketball, youth fellowship, and other activities directly related to CCP's religious mission.

The Commission additionally found that, although CCP used the gymnasium to benefit members and non-members in a manner similar to that of other churches, it also utilized a fee-based public membership program and fee-based group and individual instruction classes in a manner similar to secular fitness facilities. It determined that the facility was therefore not used exclusively for religious purposes, but served both exempt and non-exempt purposes. The Commission accordingly found that the pro rata exemption determined by the ALJ was appropriate.

The trial court additionally found that CCP's website invited the general public to join the HAC, that approximately one-half of the members of the HAC were not church members, and that both church members and non-members were expected to pay HAC membership fees. The trial court adopted the ALJ's conclusion that, in light of *Middle Tennessee Medical Center v. Assessment Appeals Commission*, No. 01A01-9307-CH-00324, 1994 WL 32584 (Tenn. Ct. App. Feb. 4, 1994), *perm. app. denied* (Tenn. May 9, 1994), "it is difficult to conceive that the construction and operation of a physical fitness center for the general public could be directly incidental to or an integral part of an exempt purpose of a *church*, but not of a nonprofit *hospital*." However, the trial court did not disturb the conclusion of the ALJ and Commission that CCP's use of the gymnasium for Upward Basketball, youth fellowship and other church-related activities qualified the facility for a fifty percent *pro rata* tax exemption.

In its brief to this Court, CCP asserts that the bookstore and gift items offered by the bookstore "promoted peace of mind and offered products to help people on their spiritual journey[,]" and that the materials available in the bookstore were directly related to that mission. It additionally asserts that the State's comparison of the bookstore/café to an independent Christian bookstore is "hyperbole," and that characterizing it as "retail" or "commercial" does not justify denying the tax exemption. It asserts that the statutory and case law do not require the denial of an exemption because the property in some way competes with a commercial enterprise, and that the "competition concern" is not dispositive. CCP further asserts that the competition concern is neither relevant nor applicable where the exemption statutes provide exemptions for college and university bookstores.

CCP also contends that the relevant, dispositive factors in *Middle Tennessee Medical Center* with respect to fees, advertizing and use by the general public were not present in this case. It submits that CCP charges a small yearly fee for use of the fitness center, and that it provided free membership for those who could not afford the fee. It asserts that its membership fee did "not even come close to mimicking a commercial business[,]" that it did not advertise the center to the general public, and that there was no evidence that members "deliberately chose [its] facility over commercial enterprises." CCP submits that its "facilities are oriented toward members of the church and the surrounding neighborhood who need a

safe place to go and who then may be introduced to biblical principles."

As the trial court observed, the "key element" in this case is the characterization of CCP's use of the spaces and, whether these uses qualify the spaces as exempt under section 67-5-212. "It is use of the property, and not the charitable nature of its owner, which determines its exempt status." *Youth Programs, Inc. v. Tennessee State Bd. of Equalization*, 170 S.W.3d 92, 98 (Tenn. Ct. App. 2004) (citing *Mid–State Baptist Hosp., Inc. v. City of Nashville*, 211 Tenn. 599, 366 S.W.2d 769, 772 (1963)). Upon review of the record, we note that CCP consistently characterized the bookstore/café and fitness center areas as "third spaces" that benefitted both church members and non-members who might feel uncomfortable or "threatened" in a traditional church environment. The administrative record contains a document entitled *Implications of Faith: A Defense of the Religious Use of Social Third Space* written by CCP senior pastor Dan Scott ("Pastor Scott"), which characterized third spaces as those "where one expresses his or her being as part of meaningful community." Pastor Scott urged that third spaces have "become a huge need for many urban dwellers for whom family and community are now distant abstractions." He asserted that "fourth spaces" consist of sanctuaries - "the place where we experience God [and that] is obviously the heart of our spiritual work," and that third spaces "exist to meet a primal spiritual need: human connection with our fellow believers in the midst of an increasingly impersonal urban space." Pastor Scott wrote, "[t]his is particularly crucial for the low income and immigrant populations to which we minister in great numbers." Pastor Scott submitted that CCP's "'third space' facilities are natural outgrowths of our ancient faith" that have been "retooled . . . for post-modern urban culture." He urged that the State should recognize third spaces as part of CCP's "stated purpose as a religious body" and that its third spaces should be exempt from taxation "in the same manner as its sanctuaries."

The tribunals below were not insensitive to CCP's assertions with respect to "third spaces." They determined, however, that the bookstore/café and gymnasium/fitness center areas were operated primarily as retail/commercial facilities and were not directly incidental to, or an integral part of, the recognized purposes of a church. The trial court noted that CCP had "crafted a mission statement representing its potentially taxable endeavors as key elements in its religious purpose." It observed that, under CCP's mission statement and reasoning with respect to third spaces, "almost *any* use of CCP's new facility that was geared toward attracting members of the public could be deemed a part of CCP's purpose, since those activities create an opportunity for the church to proselytize and recruit new members." The trial court concluded that the tax exemption provided by Tennessee law was not as broad, however, as that urged by CCP. It held that, although CCP's use of the disputed areas may have been effective to attract new members to CCP, the exemption was not intended to apply to such use. We agree.

-11-

The courts have interpreted the "exclusive use" requirement contained in Tennessee Code Annotated § 67-5-212 to apply to the "direct and immediate use of the property itself and not to any indirect and consequential benefit to be derived from its use." *Book Agents of the Methodist Episcopal Church v. State Bd. of Equalization*, 513 S.W.2d 513, 524 (Tenn. 1974) (citation omitted). The requirement is met when "the use is 'directly incidental to or an integral part of' one of the recognized purposes of an exempt institution." *Methodist Hosp. of Memphis v. Assessment Appeals Comm'n*, 669 S.W.2d 305, 307 (Tenn. 1984)). Under that test, the courts have held that a hospital employee parking facility was exempt from taxation where it was "an essential and integral part of" the hospital, *Methodist Hospitals*, 669 S.W.2d 305; that laundry facilities of a non-profit cooperative whose members were hospitals and that supplied laundry services to those members was exempt, *Shared Hospital Services Corp. v. Ferguson*, 673 S.W.2d 135 (Tenn. 1984); and that a hospital gift shop was exempt from taxation, *Middle Tennessee Medical Center v. Assessment Appeals Commission*, No. 01A01-9307-CH-00324, 1994 WL 32584 (Tenn. Ct. App. Feb. 4, 1994), *perm. app. denied* (Tenn. May 9, 1994). Conversely, we have held that church property used to provide housing to missionaries returning temporarily to the United States was not exempt under section 67-5-212 because such use was not directly incidental to or reasonably necessary for the church's missionary work. *First Presbyterian Church of Chattanooga v. Tennessee Bd. of Equalization*, 127 S.W.3d 742 (Tenn. Ct. App.2003), *perm. app. denied* (Tenn. Feb. 2, 2004). We similarly held that retirement community property owned by a religious institution was not exempt from taxation. *Christian Home for the Aged, Inc. v. Tennessee Assessment Appeals Comm'n.*, 790 S.W.2d 288, 291 (Tenn. Ct. App.1990), *perm. app. denied* (Tenn. May 7, 1990). We determined in *Christian Home*, however, that a chapel located within the community was exempt. *Id.* In *Book Agents*, the supreme court determined that property owned by religious institutions and used to print and publish religious and secular material was exempt from taxation to the extent it was used to print and publish material for use by the religious institutions, but not to the extent it was used to publish books and materials for the general public. *Book Agents of the Methodist Episcopal Church v. State Bd. of Equalization*, 513 S.W.2d 513, 514 (Tenn. 1974). *In Middle Tennessee Medical Center*, we affirmed a partial tax exemption for a fitness center operated by a hospital in the amount of 15 percent of the center's value. *Middle Tennessee Med. Ctr.*, 1994 WL 32584, at *1.

As CCP asserts, that the activities of a charitable institution are similar to or compete with a tax-paying business does not, by itself, render the charitable institution's property taxable. *Youth Programs, Inc. v. Tennessee State Bd. of Equalization*, 170 S.W.3d 92, 104 (Tenn. Ct. App. 2004)(citing *Book Agents*, 513 S.W.2d at 523). Conversely, property owned and used by a charitable institution is not automatically exempt from taxation merely because the use may "be characterized as generally promoting the institution's purpose in some way, particularly where the use is a revenue-generating one." *Id.* at 103. "The primary inquiry . . . [is] whether the non-profit, educational, charitable, or religious institution or hospital use[s]

the property exclusively and purely for the purpose(s) for which the institution was created or exists, or for a purpose directly incidental to the institutional purpose(s)." *Id.* at 105. That inquiry is determinative here.

Upon review of the record, we affirm the Board's determination that CCP's use of the bookstore/café did not qualify that space for the tax exemption provided by section 67-5-212, and that CCP's use of the fitness center/gymnasium qualified that area for a partial, 50 percent exemption. Like the trial court, we are not insensitive to Pastor Scott's assertion that "third spaces" meet an important need in contemporary urban society. However, the record does not preponderate against the findings of the lower tribunals that the bookstore/café area in this case was nothing short of a retail establishment housed within the walls of the Community Life Center, complete with paid staff, inventory control, retail pricing, and a wide array of merchandise for sale to the general public. CCP's use of the area was a far cry from the traditional use of church facilities and gathering areas for worship and fellowship, religious education, church dinners, meetings, and distribution of materials. Similarly, the fee-based membership fitness center and gymnasium, complete with paid professional classes under a fee-splitting arrangement with instructors, was operated, in large part, as a commercial entity. CCP's assertion that the areas were "non-threatening" spaces that benefitted CCP's outreach efforts to attract new members to the church is not disputed. However, we agree with the trial court that virtually any use of church property could be so characterized.

In 1883, the General Assembly enacted the initial legislation exempting "all property belonging to any religious charitable, scientific, literary or educational institution, and actually used for the purposes for which such institution was created." *City of Nashville v. State Bd. of Equalization*, 360 S.W.2d 458, 462 (Tenn. 1962). The exemption statutes have been redefined and limited over time, and the General Assembly and the courts have recognized that

> "any business enterprise may be organized, and purporting to be an agency or auxiliary of a religious, literary, educational, scientific, or charitable institution, run, free from taxation, in competition with other like institutions; and so, finally, *all business in the state might be run, as competition by taxed enterprises would be driven out.*"

*Id.* (quoting *Book Agents of Methodist Episcopal Church, South v. Hinton*, 21 S.W. 321, 325 (Tenn. 1893) (Snodgrass, J., dissenting)(emphasis added) and stating: "There was, however, a vigorous dissent by Justice Snodgrass, expressing the view, which has since been widely accepted, that the intent of the Constitution and of the act was to exempt only such of the institution's property as was physically occupied by it and used directly for its necessary purposes, and not property used for other purposes or business from which it derived a

-13-

consequential benefit; that the exemption did not depend on how the profits from such business might be ultimately used[.]")  In this case, we agree with the trial court that CCP's characterization of its use of the disputed portions of the Family Life Center as part of its outreach ministry could apply to virtually any use.

The facts do not preponderate against the determination of the Board and the trial court that the bookstore/café area was a retail establishment open to the general public, and their determination that the fitness center/gymnasium was operated, in part, as a commercial enterprise.  In light of *Book Agents*, *First Presbyterian*, and *Christian Home for the Aged*, we affirm the determination of the trial court that, as a matter of law, CCP's use of the cafe/bookstore area did not qualify the area as exempt under the statute.  We also affirm the determination of the trial court that the gymnasium/fitness center qualified for a partial, *pro rata* exemption under the supreme court's reasoning in *Book Agents*.

### *Establishment Clause of the First Amendment*

We turn next to CCP's assertion that this holding unconstitutionally entangles the State in matters of church doctrine in violation of the Establishment Clause of the First Amendment.  CCP's argument, as we understand it, is that the determination that CCP did not use the bookstore/café and fitness center areas purely and exclusively for religious purposes imposes a definition of "religious" or "religious purpose" in contravention of the First Amendment.  CCP asserts that the trial court's determination "excessively entangles the government with church doctrine and theology and substitutes the wisdom of the state for the doctrine of the church in contravention of the Establishment Clause."  We disagree.

The First Amendment prohibits the regulation of religious beliefs by the government, or governmental interference in matters of church doctrine or the dissemination of religious ideas.  *Covenant Community Church v. Lowe*, 698 S.W.2d 339, 341 (Tenn. 1985)(citing *Gillette v. United States*, 401 U.S. 437, 462, 91 S.Ct. 828, 842, 28 L.Ed.2d 168 (1971)).  Thus, the courts have long held that, under the First Amendment, we may not interfere with matters of faith, doctrine, or government of religious institutions.  *Hosanna-Tabor Evangelical Lutheran Church and School v. Equal Emp't Opportunity Comm'n*, 132 S.Ct. 694, 704 (2012).  The constitutional right to religious liberty encompasses the right to one's belief and the right to profess one's religious doctrine, and the right to act in a manner that is consistent with one's religious beliefs.  *State ex rel. Comm'r of Transp. v. Medicine Bird, et al.*, 63 S.W3d 734, 762 (Tenn. Ct. App. 2001).  Both the First Amendment and the Tennessee Constitution require the State to pursue a neutral course toward religion, one "that does not favor one religion over another or religious adherents collectively over nonadherents." *Martin v. Beer Bd. for City of Dickson*, 908 S.W.2d 941, 949 (Tenn. Ct. App. 1995) (citing *Bd. of Educ. v. Grumet*, 512 U.S. 687, 696), 114 S.Ct. 2481, 2487, 2491, 129 L.Ed.2d 546 (1994)).

Additionally, although laws may not interfere with religious belief, they may interfere with conduct that is religiously motivated. *Medicine Bird*, 63 S.W.3d at 762. Our supreme court has observed that "total separation of church and state is not possible, and that an inescapable tension exists in trying to prevent the church or the state from intruding upon the other." *Covenant Community Church*, 698 S.W.2d at 341 (citing *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 1358, 59, 79 L.Ed.2d 604 (1984)). "[S]ome tension is inevitable." *Id.* A statute does not violate the Establishment Clause if it has a secular legislative purpose, its principal or primary effect neither advances nor inhibits religion, and it does not foster an excessive government entanglement with religion. *Id.* (citing *Lemon v. Kurtzman*, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971)). To comply with the Establishment Clause, a statute must satisfy each of these factors. *Martin,* 908 S.W.2d at 950 (citing *Edwards v. Aguillard*, 482 U.S. at 583, 107 S.Ct. at 2577; *Stone v. Graham*, 449 U.S. 39, 40-41, 101 S.Ct. 192, 193, 66 L.Ed.2d 199 (1980)).

The taxation statutes clearly have a secular purpose, and that the tax burden be shared equitably is a constitutional mandate. Article II, Section 28 of the Tennessee Constitution "does not grant any tax exemption, does not establish any public policy of exemption, but merely authorizes, permits, the Legislature to grant exemption in the cases specified." *City of Nashville v. State Bd. of Equalization*, 360 S.W.2d 458, 462 (Tenn. 1962). As noted above, in 1883 the General Assembly enacted Tennessee's initial statutory exemptions, and we have construed them "liberally in favor of charitable institutions in recognition that such institutions confer a benefit on the public and consequently relieve, to some extent, the state's burden to care for and advance the interests of its citizens." *Youth Programs, Inc. v. Tennessee State Bd. of Equalization*, 170 S.W.3d 92, 103 (Tenn. Ct. App. 2004) (citing *Book Agents of the Methodist Episcopal Church v. State Bd. of Equalization*, 513 S.W.2d 514, 521 (Tenn.1974)(quoting *M.E. Church, S. v. Hinton*, 92 Tenn. 188, 21 S.W. 321, 322 (Tenn.1893))).

It is well-settled that the State may not use its taxing authority to prevent or impede the dissemination of specific religious views. *State v. Loudon*, 857 S.W.2d 878, 880 (Tenn. Ct. App 1993)(citing *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943)). CCP asserts that, in this case, the determination that it did not use the disputed areas of the Family Life Center exclusively for the purposes for which CCP exists as a religious institution impermissibly entangles the State in matters of church doctrine by defining a "religious use." CCP relies on case law from our sister jurisdictions for the proposition that, in the taxation context, the court must accept CCP's characterization of its activities and beliefs as religious. CPP quotes the Colorado case of *Maurer v. Young Life*, 779 P.2d 1317, 133 n.21 (Col. 1989), for the proposition that "[a]voiding a narrow construction of property tax exemptions based upon religious use also serves the important purpose of avoiding any detailed governmental inquiry into or resultant endorsement of religion that would be

prohibited by the establishment clause of the first amendment to the United States Constitution." It also relies on *Fairview Haven v. Department of Revenue*, 506 N.E.2d 341 (Ill. App. Ct. 1987) and *Holy Spirit Association for the Unification of World Christianity v. Tax Commission*, 435 N.E.2d 662 (N.Y. Ct. App. 1982), for the proposition that the taxing authorities must accept a religious institution's characterization of its activities.

The State, on the other hand, asserts that the Board accepted at face value CCP's assertion that its use of the disputed areas furthered CCP's ministry. The State asserts that the Board "merely applied the rule that religious institutions are not entitled to a property tax exemption for those portions of property on which they operate secular business enterprises." It asserts that the Board's decision was not based on doctrine, but on the determination that CCP's actual use of the property was neither directly incidental to nor an integral part of its stated mission. The State submits that, as the Board noted, CCP's mission to spread the Gospel is similar to that of other Christian churches in the area. It asserts that whether the manner in which the property was used relates not to doctrine, but to the nature and character of use.

In *Maurer*, the Colorado Supreme Court considered whether property owned by Young Life, a nonprofit corporation whose purpose included the promotion of evangelistic Christian testimony among adolescents, qualified for exemption from taxation based on Young Life's use of the property for youth camps that included religious worship and reflection. *Maurer v. Young Life*, 779 P.2d 1317, 1319 & 1331 (Colo. 1989). In affirming the exemption granted by the Colorado Board of Assessment Appeals ("the Colorado Board"), the *Maurer* court stated, "[i]n determining whether the Young Life properties qualified for an exemption based on use for religious worship and reflection, the [Colorado] Board must examine the use to which the property is put, not the character of the owner." *Id.* The court further stated that "the character of the owner may often illuminate the purposes for which the property is used and need not be excluded from consideration." *Id.* (quoting *West Brandt*, 652 P.2d at 567-68. *Accord Kemp v. Pillar of Fire*, 94 Colo. 41, 42, 27 P.2d 1036, 1036 (1933)). The *Maurer* court affirmed the exemption granted by the Colorado Board on the basis that

> the uses of the properties were to advance in an informal and often indirect manner Young Life's purposes, including promotion of an evangelistic Christian testimony among adolescents, the Board could and did conclude that any nonreligious aspects of these activities were necessarily incidental to the religious worship and reflection purposes for which Young Life claimed the properties were used.

*Id.* The footnote quoted by CCP in its brief supported the proposition advanced by the Colorado court that "strict construction for tax exemption statutes 'does not mean that the

narrowest possible interpretation be given'"[.] *Id.* at 1333 (quoting *Bishop of the Roman Catholic Diocese v. Kinney*, 2 Ohio St.3d 52, 442 N.E.2d 764 (1982)). As noted above, unlike most jurisdictions, in Tennessee tax exemption statutes are construed liberally in favor of charitable and religious institutions. The analysis undertaken by the *Maurer* court, like the analysis undertaken here, was predicated on the character of the taxpayer and on the manner in which the taxpayer used the property.

In *Fairview Haven*, the Illinois Appellate Court considered whether real property owned by a not-for-profit corporation organized by four Apostolic Christian Church of America congregations was exempt from taxation. The taxpayer, Fairview, was organized for religious and charitable purposes for the care and keeping of elderly people. *Fairview Haven v. Dep't of Rev.*, 506 N.E.2d 341, 343 (Ill App. 1987). It accepted paying, non-paying, and part-paying residents on the basis of financial need and to the extent that it was not financially jeopardized. *Id.* at 343-44. Church elders testified in *Fairview Haven* that

> [t]here was a need in the community to care for the elderly in a non-warehouse fashion and be a source of Christian atmosphere. One of the basic tenets of the church is that salvation is accomplished through faith and Christian witness. Therefore, everyone has a duty to preach the gospel and do Christian service works. The church tries to create avenues through which members can show their faith by accomplishing Christian service works. Fairview exists to meet the above goal, and the motivating factor behind Fairview's operation is to provide an opportunity to help the elderly and fulfill the tenets of the Apostolic Christian Church. Fairview is listed as an outreach ministry of the national church.

*Id.* at 345. A member of Fairview's board testified that "Fairview implements the church's ministry by tying preaching to action." *Id.* Sixty percent of the residents of Fairview were members of the church; forty percent of Fairview's employees were members of the church; and Fairview provided counseling and Bible study for residents and their families. *Id.*

The statute considered by the Fairview court provided:

> All property of institutions of public charity, all property of beneficent and charitable organizations, * * * and all property of old people's homes, when such property is actually and exclusively used for such charitable or beneficent purposes, and not leased or otherwise used with a view to profit" (Ill. Rev. Stat.1981, ch. 120, par. 500.7) "is exempt from taxation" (Ill. Rev. Stat.1981,

-17-

ch. 120, par. 500).[4]

*Id*. at 346. The only issue before the court in *Fairview Haven* was whether the property was used exclusively for charitable purposes. *Id.* The *Fairview Haven* court determined that a portion of Fairview's property was entitled to a charitable-use exemption, and that a portion was not. The court stated that the evidence supported a finding that "based upon the actual method of operation that Fairview was not exempt for religious purposes was supported by the evidence." *Id.* at 349 (citation omitted).

The *Fairview Haven* court was guided by the New York Court of Appeals' analysis in *Holy Spirit v. Tax Commission*, upon which CCP also relies, in its First Amendment analysis. As CCP asserts, the *Fairview Haven* court observed that first "[i]n the tax context, the first amendment requires the court to accept the entity's characterization of its activities and beliefs as religious as long as the characterization is in good faith." *Id.* at 348 (citing *Holy Spirit Association for the Unification of World Christianity v. Tax Commission* (1982), 55 N.Y.2d 512, 518, 450 N.Y.S.2d 292, 293, 435 N.E.2d 662, 663). The *Fairview Haven* court noted that, after accepting the organization's characterization of its activities, the court must then "determine whether the property is in fact exclusively used for religious purposes." *Id.* at 348 (citation omitted). The court noted that the Illinois Department of Revenue had not rejected Fairview's characterization of the Apostolic Christian Church's belief, assessed its doctrine, or rejected its contention that part of its use furthered religious purposes. It continued,

> [i]nquiry into the primary use to which property is in fact put under the facts presented in this case does not necessarily violate a party's first amendment rights as it neither assesses the inherent validity of the belief structure, nor determines whether the particular conduct conforms to the standards or purposes of a religious group. . . . Inquiry into the use to which the property was put is not precluded by constitutional principles.

*Id.* (citation omitted). The *Fairview Haven* court stated,

> [h]ere it is not contested that the operation of Fairview provided an opportunity for members of the Apostolic Christian faith to carry out Christian service work, care for the elderly, and engage in evangelization. However, operation of the nursing home was not necessary for these religious purposes, which could also have been accomplished through other means. . . . the practice of

---

[4]We note that, unlike Tennessee's charitable exemption statutes, Illinois statutes granting real estate tax exemptions are strictly construed in favor of taxation. *Fairview Haven*, 506 N.E.2d at 346. That distinction does not affect our analysis of this issue, however.

-18-

charity, kindness to other persons and in particular to the aged, and the practice of all virtues are encouraged by religious organizations; however, it cannot be stated that they are religious purposes within commonly accepted definitions of the word.

*Id.* at 349 (citing *Yakima First Baptist Homes, Inc. v. Gray*, 510 P.2d 243 (Wash. 1973)).

The analysis employed by the *Fairview Haven* court is equally applicable here. The imposition of property tax on church property that is, by character and manner of use, essentially commercial in nature does not interfere with CCP's doctrine, beliefs, faith, or government. We accept CCP's assertion that providing "third spaces" is part of its outreach ministry. However, we agree with the trial court that CCP's operation of a retail bookstore/café and commercial fitness center was not reasonably necessary to accomplish this mission.

### *The Free Exercise Clause and The Religious Freedom Restoration Act*

We turn next to CCP's assertion that the Board's determination violates the Free Exercise Clause of the First Amendment. CCP asserts the Board's determination substantially burdens its free exercise of religion without a compelling reason and without employing the least restrictive means. CCP contends that the tax exemption statutes are not generally applicable where they create exemptions for university bookstores and family wellness centers but deny the exemption to "identical religious use." It further contends that the taxes levied impose a substantial burden on its ministries, and that "[w]hatever interest the State has in ensuring a uniform taxation of property is undermined completely by the exceptions to the statute contained in the college and university bookstore exemption and in the family wellness center exemption."

The State, on the other hand, contends that the partial denial of CCP's application for property tax exemption does not prohibit or restrict its religious practices. It asserts that the State has taken no action that would preclude CCP from performing its outreach ministries, but that it has merely denied a tax exemption for that portion of CCP property that was used to operate retail commercial facilities. It submits that CCP is free to provide whatever community outreach programs it deems appropriate.

As noted above, the Free Exercise Clause bars governmental regulation of religious beliefs as such, or interference with the dissemination of religious ideas. *Covenant Community Church v. Lowe*, 698 S.W.2d 339, 341 (Tenn. 1985)(citing *Gillette v. United States*, 401 U.S. 437, 462, 91 S.Ct. 828, 842, 28 L.Ed.2d 168 (1971)). The Free Exercise Clause guarantees

"a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine."

*Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 447 (Tenn. 2012)(quoting *Watson v. Jones*, 80 U.S. 679 (1872)). The free exercise of religion encompasses physical acts in addition to beliefs. *Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 877, 110 S.Ct. 1595, 1599 (1990)). This freedom from state interference has given rise to the ecclesiastical abstention doctrine, pursuant to which the secular courts decline to adjudicate issues involving the internal governance of religious bodies or issues involving matter of theology, spiritual judgment or religious doctrine or practice. *Id.* It also has given rise to the "ministerial exception," which bars the application of legislation prohibiting discrimination in the employment context to claims involving "the employment relationship between a religious institution and its ministers." *Hosanna–Tabor Evangelical Lutheran Church and School v. Equal Emp't Opportunity Comm'n*, 132 S.Ct. 694, 705 (2012).

"[R]eligious institutions are not above the law[,]" however. *Redwing*, 363 S.W.3d at 450. Although the law may not interfere with religious beliefs, they may interfere with conduct that is religiously motivated. *State ex rel. Comm'r of Transp. v. Medicine Bird, et al.*, 63 S.W.3d 734, 762 (Tenn. Ct. App. 2001)(citations omitted). In *Medicine Bird*, we noted that

[t]he government cannot enact laws that have no purpose other than to prohibit particular religious practices unless these laws are justified by a compelling interest and are narrowly tailored to advance that interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 113 S.Ct. 2217, 2227, 124 L.Ed.2d 472 (1993). Likewise, the government cannot enact laws that discriminate against some or all religious beliefs or that regulate or prohibit conduct simply because it is undertaken for religious reasons. *Braunfeld v. Brown*, 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563 (1961); *Fowler v. Rhode Island*, 345 U.S. 67, 69–70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953). Finally, the government cannot interpret, apply, or enforce facially neutral laws in a discriminatory manner. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. at 533–34, 113 S.Ct. at 2227.

*Id.* at 763.

The First Amendment does not relieve religious groups from all the financial burdens

of government, however. *Covenant Community Church,* 698 S.W.2d at 341 (citing *Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105, 112, 63 S.Ct. 870, 874, 87 L.Ed. 1292 (1943)). The Supreme Court has noted that "[s]ituations will arise where it will be difficult to determine whether a particular activity is religious or purely commercial. The distinction at times is vital." *Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105, 110, 63 S.Ct. 870, 874 (1943)). In *Covenant Community Church*, the Tennessee Supreme Court held that the imposition of the five percent privilege tax on motel rooms rented by a church to be used for worship and religious instruction did not violate the Free Exercise Clause or the Establishment Clause where it was "a tax upon the secular activity of occupying a hotel or motel room" and not a tax on religious practice. *Covenant Community Church,* 698 S.W.2d at 341. In *Book Agents*, the supreme court held that property owned by religious institutions was not exempt from taxation to the extent that the institutions used the property to print and publish books for the general public. *Book Agents of the Methodist Episcopal Church v. State Bd. of Equalization*, 513 S.W.2d 514, 524 (Tenn. 1974). The *Book Agents* court also held that an area of a religious institution's headquarters that was used as a clinic area was not exempt from taxation. *Id.* at 525. In *Department of Human Services v. Priest Lake Community Baptist Church*, we affirmed the trial court's determination that a church's Bible School met the statutory definition of a child-care center and was, therefore, subject to State rules and regulations applicable to child-care centers notwithstanding the church's assertion that the school was a church "ministry." *Dep't of Human Servs. v. Priest Lake Comm. Baptist Church*, No. M2006-00302-COA-R3-CV, 2007 WL 1828871, at *5 (Tenn. Ct. App. June 25, 2007).

The State may, "enact and enforce facially neutral and uniformly applicable laws that have the incidental effect of burdening a religious practice. When this sort of law faces a free exercise challenge, the government is not required to justify it with a compelling governmental interest." *State ex rel. Comm'r of Transp. v. Medicine Bird, et al.*, 63 S.W.3d 734, 763 (Tenn. Ct. App. 2001)(citations omitted). The purpose of the State's taxation laws clearly are not to interfere with or suppress religious practice. Neither the tax laws or the statutorily defined exemptions discriminate against any particular religion or prohibit or impede any particular practice. They are neutrally applied without regard for religious doctrine or belief. They do not compel CCP to violate or abandon any particular belief, or prevent CCP from any practice. We accordingly affirm on this issue.

We likewise affirm the trial court's determination that the State's partial denial of CCP's application for exemption for areas used for retail/commercial uses does not violate Tennessee's Religious Freedom Restoration Act. The Religious Freedom Restoration Act codified at Tennessee Code Annotated § 4-1-407(2011) provides:

(b) Except as provided in subsection (c), no government entity shall

substantially burden a person's free exercise of religion even if the burden results from a rule of general applicability.

      (c) No government entity shall substantially burden a person's free exercise of religion unless it demonstrates that application of the burden to the person is:

      (1) Essential to further a compelling governmental interest; and

      (2) The least restrictive means of furthering that compelling governmental interest.

Tenn. Code Ann. § 4-1-407(b)&(c). The section defines "substantially burden" to mean "to inhibit or curtail religiously motivated practice." Tenn. Code Ann. § 4-1-407(a)(7). The courts review claims asserting a violation of section 4-1-407 on a case-by-case basis to determine whether a cognizable religious belief is at issue. *Johnson v. Levy*, No. M2009-02596-COA-R3-CV, 2010 WL 119288, at *2 (Tenn. Ct. App. Jan. 14, 2010).

As noted above, the State has a compelling interest in ensuring a fair distribution of the tax burden. That interest is not disputed by CCP. As also noted above, the State's partial denial of a tax exemption for property used by CCP for retail and commercial purpose does not burden CCP's free exercise of religion. The tax exemption statutes do not prohibit or coerce any act contrary to religious belief.

### *Equal Protection*

We turn finally to CCP's assertion that denying CCP a tax exemption for areas used as a bookstore/café and fitness center violates the Equal Protection Clause of the United States Constitution where property used by other charitable institutions for similar purposes is exempt. CCP asserts that it is similarly situated to family wellness centers where it used its fitness center in a manner consistent with Tennessee Code Annotated § 67-5-225, and that it is similarly situated to colleges and universities where it used its bookstore to provide books and other items to church members and others who visited the CCP campus. CCP's argument, as we understand it, is that because it used the disputed areas in a manner similar to other types of charitable institutions, its property should be likewise exempt. CCP asserts, "[t]he only discernible difference between a hospital bookstore and [CCP's] bookstore is in the purpose of the organization and that is an insufficient basis upon which to treat two similarly situated entities differently." It additionally asserts that the exemption granted to community and performing arts centers under Tennessee Code Annotated § 67-5-223(a) is "much less rigorous" than the exemption provided for churches, and that the State has not demonstrated a compelling reason to treat similarly situated entities differently.

As the State asserts, CCP's argument, taken to its logical conclusion, would entitle

CCP to operate a wellness center, a nonprofit hospital, an educational institution and other facilities without meeting the statutory requirements applicable to those facilities. We further observe that, under CCP's analysis, virtually all property used by any charitable or religious institution would be entitled to an exemption from taxation where the statutes exempt property similarly used by another type of charitable entity. Thus, nonprofit hospitals and community performing arts centers necessarily would be entitled to a property exemption for a wellness center. We disagree.

The Equal Protection Clause of the Fourteenth Amendment to the Untied States Constitution and the Class Legislation Clause of Article XI, Section 8 of the Tennessee Constitution require that persons who are similarly situated be treated alike. *Evans v. Steelman*, 970 S.W.2d 431, 435 (Tenn. 1998)(citations omitted). Equal Protection does not require, however, that

> "things which are different in fact or opinion to be treated in law as though they were the same." *Tigner v. State*, 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124 (1940). . . . "The initial discretion to determine what is 'different' and what is 'the same' resides in the legislatures of the States," and the legislatures are allowed considerable latitude in establishing classifications and thereby determining what groups are different and what groups are the same. *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982).

*State v. Smoky Mountain Secrets, Inc.*, 937 S.W.2d 905, 912 (Tenn. 1996). Thus, as an initial matter, the court must determine whether persons are "similarly situated" for the purposes of the Equal Protection Clause. *Posey v. City of Memphis*, 164 S.W.3d 575, 579 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 67-5-213(a) provides an exemption from taxation for property owned by educational institutions and used for student dormitories, and section 67-5-213(d) provides an exemption for bookstores owned by nonprofit colleges and universities and operated not-for-profit. Tennessee Code Annotated § 67-5-212(b)(3)(B) extends the effective date of exemption for property acquired by one religious institution from another. Section 67-5-212(c) defines "charitable institution" as "any nonprofit organization or association devoting its efforts and property, or any portion thereof, exclusively to the improvement of human rights and/or conditions in the community." Section 67-5-212(i) exempts from taxation property of nonprofit county fair associations. Thus, notwithstanding the exemption granted by Tennessee Code Annotated 67-5-212 to property owned and used by charitable, scientific, educational or religious entities, the legislature clearly has classified the organizations differently notwithstanding that a portion of their property may be used for similar purposes.

Additionally, as discussed above, in *Middle Tennessee Medical Center*, we affirmed the trial court's determination that a wellness center operated by a nonprofit hospital was entitled only to a partial exemption in the amount of fifteen percent. *Middle Tennessee Med. Ctr. v. Assessment Appeals Comm'n*, No. 01A01-9307-CH-00324, 1994 WL 32584 (Tenn. Ct. App. Feb. 4, 1994). In *Club Systems*, we noted that the exemption provided under Tennessee Code Annotated § 67-5-225 is not conferred

> merely because of [the center's] character or status as a family wellness center; the exemption is given because the property meets *both* the statutory definition of family wellness center (*i.e.*, it provides "physical exercise opportunities for children and adults") and the other statutory criteria governing the property's operation (*i.e.*, its charitable nature). Consequently, the statute does not create a *per se* exemption for family wellness centers that bears no relation to the property's actual use.

*Club Sys. of Tennessee, Inc. v. YMCA of Middle Tennessee*, No. M2004–01966–COA–R3–CV, 2005 WL 3479628, at *9 (Tenn. Ct. App. Dec. 19, 2005), *perm. app. denied* (Tenn. June 26, 2006)(emphasis added).

In light of the foregoing, we agree with the trial court that religious organizations are not similarly situated to family wellness centers and university bookstores. The legislature clearly has determined that they are "different." Accordingly, we affirm the trial court's determination that the partial denial of CCP's application for property tax exemption did not violate the Equal Protection Clause in this case where CCP and family wellness centers and universities are not similarly situated.

### *Holding*

In light of the foregoing, we affirm the judgment of the trial court. This matter is remanded for enforcement of the judgment and the collection of costs. Costs on appeal are taxed to the Appellant, Christ Church Pentecostal, and its surety, for which execution may issue if necessary.

_____

DAVID R. FARMER, JUDGE
