# IN THE COURT OF APPEALS OF TENNESSEE
# AT NASHVILLE
### February 27, 2015 Session

## VANDERBILT UNIVERSITY v. TENNESSEE STATE BOARD OF EQUALIZATION, ET AL.

### Appeal from the Chancery Court for Davidson County
### No. 1346IV     Russell T. Perkins, Chancellor

_____

### No. M2014-01386-COA-R3-CV-April 22, 2015

_____

Vanderbilt University applied for a 100% property tax exemption for eleven of its fraternity houses pursuant to the educational exemption, Tenn. Code Ann. § 67-5-212(a)(1), or the dormitory exemption, Tenn. Code Ann. § 67-5-213(a). The State Board of Equalization ("SBOE") denied Vanderbilt's application, and Vanderbilt sought administrative review. An administrative law judge and the Assessment Appeals Commission both reached the same conclusion as the SBOE. Vanderbilt then sought judicial review, and the trial court determined that the fraternity houses were entitled to the 100% exemption because they satisfied the requirements for the educational exemption. The State appealed, and we reverse the trial court's decision. The fraternity houses are not used "purely and exclusively" for educational purposes, as that provision has been interpreted and applied by the courts. We also decline to find the fraternity houses qualify for the dormitory exemption because they are not used primarily for dormitory purposes, as the statute requires.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed

ANDY D. BENNETT, J., delivered the opinion of the court, in which RICHARD H. DINKINS, and W. NEAL MCBRAYER, JJ., joined.

Herbert H. Slatery, III, Attorney General and Reporter; Joseph F. Whalen, Associate Solicitor General; and Brad H. Buchanan, Senior Counsel, Nashville, Tennessee, for the appellants, State of Tennessee Board of Equalization, Tennessee Assessment Appeals Commission, and Attorney General and Reporter, Herbert H. Slatery, III.

J. Brooks Fox and Catherine J. Dundon, Nashville, Tennessee, for the appellant Metropolitan Government of Nashville and Davidson County.

William L. Harbison and Carolyn W. Schott, Nashville, Tennessee, for the appellee, Vanderbilt University.

# OPINION

In this case we are asked whether eleven fraternity houses owned by Vanderbilt University (the "Fraternity Houses") are entitled to a 100% exemption from the property tax laws either because of their educational purpose or because of their use as dormitories. The Fraternity Houses were granted a 50% exemption decades prior to the instant litigation, and their entitlement to that 50% exemption is not now at issue. Today we are only concerned with determining whether their property tax exemption should be increased from 50% to 100%.

FACTUAL AND PROCEDURAL BACKGROUND

Beginning in the 1960s, Vanderbilt built houses for the fraternities and sororities on its campus and leased the houses to the fraternities and sororities. Vanderbilt sought an exemption from having to pay property taxes on those houses, which the local tax assessor denied. Vanderbilt contested the denial, and in 1968, the chancery court entered a consent order granting Vanderbilt a 50% tax exemption.[1] One of the fraternities was discontinued in 1985. When it was reinstated in 1988, Vanderbilt filed an application with the State Board of Equalization ("SBOE") seeking to reinstate the 50% exemption for that fraternity's house. The SBOE denied Vanderbilt's request. Following administrative appeals, the chancery court granted Vanderbilt the 50% exemption it sought in a Memorandum and Order entered on July 7, 1992 ("1992 Chancery Court Order"). Citing *George Peabody College for Teachers v. State Board of Equalization*, 407 S.W.2d 443 (Tenn. 1966), the court found that the fraternity's activities were "directly incidental to and an integral party of Vanderbilt's educational program." The court found that, "[i]n addition to living and eating in the houses, students study therein, have tutoring and study sessions, dances, and parties. On occasions, professors and visiting speakers at the University conduct informal discussion groups in the houses."

At the time of the 1968 consent order and the 1992 Chancery Court Order, Vanderbilt was leasing the Fraternity Houses to the national fraternities, which then leased the properties to housing corporations for the local chapters. Under this arrangement, the fraternities set the room and board rates, prescribed residential policies, and made routine repairs. Starting in the early 2000s, Vanderbilt changed its relationship with the Fraternity Houses pursuant to a Greek Facility Management Program that Vanderbilt put into place. Leases with the national organizations were renegotiated as

---

[1] The record does not include the consent decree or any details of the litigation from the 1960s.

licenses, and Vanderbilt took control over the use and maintenance of the Fraternity Houses. Vanderbilt began to bill the students who lived in the Fraternity Houses directly and became responsible for managing the properties.

In May 2007, Vanderbilt submitted property tax exemption applications to the SBOE seeking a 100% exemption for the Fraternity Houses based on its new license arrangement with the national fraternities. Vanderbilt claimed it was entitled to the exemption pursuant to Tenn. Code Ann. § 67-5-212(a)(1), which exempts from taxation real and personal property used "purely and exclusively" for educational purposes.[2] Alternatively, Vanderbilt claimed it was entitled to the exemption pursuant to Tenn. Code Ann. § 67-5-213(a), which exempts dormitories from property tax.[3] On July 28, 2009, the SBOE issued an initial determination denying the application. Vanderbilt appealed this determination, and a hearing was held before an administrative law judge ("ALJ") on January 25, 2011.

The ALJ issued an Initial Decision and Order dated July 22, 2011, affirming the initial determination and holding that the Fraternity Houses were entitled to no more than the 50% exemption they currently enjoyed. The ALJ concluded that the use of the Fraternity Houses had not changed since the 1992 Chancery Court Order was issued and that "the chapter houses are not used purely and exclusively by Vanderbilt for educational purposes." The ALJ also concluded that that the Fraternity Houses did not qualify as "dormitories."

<u>Assessment Appeals Commission Decision</u>

Vanderbilt petitioned the Assessment Appeals Commission (the "Commission") for a review of the ALJ's Initial Decision and Order. A hearing was held on May 24, 2012, during which Stephen Caldwell, Associate Dean of Students, testified about the

[2]When Vanderbilt applied for the 100% exemption, Tenn. Code Ann. § 67-5-212(a)(1) (2003) stated in relevant part:

> There shall be exempt from property taxation the real and personal property, or any part thereof, owned by any religious, charitable, scientific or nonprofit educational institution which is occupied and used by such institution or its officers purely and exclusively for carrying out thereupon one (1) or more of the purposes for which the institution was created or exists . . . . [N]o property shall be totally exempted, nor shall any portion thereof be pro rata exempted, unless such property or portion thereof is actually used purely and exclusively for religious, charitable, scientific or educational purposes.

[3] Tenn. Code Ann. § 67-5-213(a) has not undergone any changes since 2005, and it provides:

> Real estate owned by an educational institution and used primarily for dormitory purposes for its students, even though other student activities are incidentally conducted therein, and even though the student's spouse or children may reside therein, is exempt from taxation.

3

educational programs offered at the Fraternity Houses. He conceded that there is no formal system of tutoring or lectures that goes on in the Fraternity Houses. He testified, however, that the chapters sponsor at least four educational programs each year and that 65% of the membership must be present at each program. He explained:

> One program must be related to risk management, drugs, alcohol, hazing, sexual assault. One program must be related to members' health and wellness, healthy lifestyles, eating disorders, mental health, drug and alcohol abuse. . . . One program must be related to diversity, cultural, religious, political, racial. One program has to be the chapter's choice. And each chapter must plan at least one program to be a positive relationship with the faculty members each year. [Specific examples include] Zeta Pi, Professor Goodyear presented ethical and business practices; Alpha Tau Omega, professor appreciation dinner with professors from economics, engineering and math; Beta Theta Pi, presentation from criminal defense attorney; Kappa Alpha, professor sent out presentation on international diversity in business.

The evidence showed that membership in each fraternity fluctuates somewhere between forty and eighty, depending on whether freshmen have been admitted for the year yet, but only up to six members actually reside in a Fraternity House, all of whom must be officers of the fraternity. Dean Caldwell testified that Vanderbilt charges a fee to members who live in the Fraternity Houses just as Vanderbilt charges students who live in dormitories on campus. Nonresident members of the fraternities are charged a fee to live in campus dormitories as well as a Greek facility maintenance fee that allows them access to the Fraternity Houses. Dean Caldwell testified that the Fraternity Houses host, on average, three parties each month where alcohol is permitted, and that third-party security is provided by Vanderbilt for these parties.

Dean Caldwell also testified about students' access to dormitories and to the Fraternity Houses. Generally, a student does not have access to a dormitory unless he or she is a resident there. For a Fraternity House, by contrast, resident members as well as nonresident members have a key granting them access to the Fraternity House. Thus, whereas the common areas of dormitories are limited to the students who live there, the common areas of the Fraternity Houses are open to all members of the fraternity.

The Assessment Appeals Commission entered its Final Decision and Order on August 30, 2012, in which it affirmed the ALJ's decision. The Commission began by addressing Vanderbilt's contention that the Fraternity Houses are used no differently than the typical dormitory. Disagreeing with Vanderbilt's position, the Commission wrote:

> Most dormitories serve far more students. . . . The fraternity houses at issue here typically house at most six student fraternity members chosen

4

by the fraternity, usually its officers. Vanderbilt in modern times has constructed a range of living facilities for its students that now include . . . a collection of twenty ten-person lodges. Other specialty living facilities have been built in recent years for smaller resident groups, and there, like all dormitories, contain common areas where residents dine, relax, or study, but the area devoted to student-rented rooms predominates. Dormitories, but not fraternity houses, have information desks and continuous presence of university faculty, staff or other representatives.

Unlike the dormitories, the properties at issue here were built as fraternity club houses, and the nonresident members of the fraternities defray the cost of maintaining and improving these club houses. The national fraternities, with whom the local chapters must be affiliated, have accumulated debt owed to Vanderbilt, and the university charges fraternity members and facilitates fundraising among fraternity alumnae, to pay down these debts and fund continuing improvements to the fraternity houses. Speakers from the university and elsewhere in government and academia are featured in the fraternities, but at the invitation of the fraternity, not as part of the educational program of the university.

The university is solely responsible for placement of dorm residents. The dormitories are focused on living facilities for students assigned by the university, with university assigned dorm counselors. Social events in the dorms share nothing of the quantity and scope of their fraternity house counterparts. They are seldom if ever "registered" with the university, but fraternity social events are routinely registered, and third party security presence is required for registered social events in the fraternities.

The Commission next addressed, and rejected, Vanderbilt's argument that the Fraternity Houses serve an educational purpose. It stated:

There are distinctly educational activities carried out at the fraternities, but they do not appreciably differ from those that supported the award of a fifty percent exemption in the past. They are merely coincidental to the primarily social purposes served by the fraternities. These social purposes contrast sharply with the primarily student housing uses of the dormitories, which are directly incidental to Vanderbilt's educational purposes. Fraternities afford their members a unique life experience that is valuable to their members, but these worthwhile social and personal experiences are distinct from the education Vanderbilt provides to its students, whether or not they are fraternity members.

5

The Commission concluded its analysis by stating: "[D]espite Vanderbilt's ownership of the properties, their use does not differ appreciably from the time the one-half exemption was approved in 1968 and 1992, and the properties are used at least as much for the fraternities' purposes as for Vanderbilt's."

Trial Court Decision Granting 100% Exemption

Having exhausted its administrative remedies, Vanderbilt filed a petition in chancery court in January 2013 seeking judicial review of the commission's decision pursuant to Tenn. Code Ann. § 67-5-1511 and § 4-5-322. No additional evidence was presented. A hearing was held on July 17, 2013, and on June 17, 2014, the trial court filed a Memorandum and Order reversing the decisions below. The trial court declined to find the Fraternity Houses are used "primarily for dormitory purposes for its students" to satisfy the dormitory exemption, but it granted Vanderbilt the 100% property tax exemption it sought based on the educational-purpose exemption set forth in Tenn. Code Ann. § 67-5-212(a)(1).

In ruling that Vanderbilt was entitled to the 100% exemption, the trial court reviewed the 1992 Chancery Court Order and wrote:

> Consistent with Chancellor High's decision in 1992, this Court concludes that Vanderbilt's chapter houses meet the educational purposes exemption; that the chapter houses are an integral part of Vanderbilt's housing program; that Vanderbilt's housing program . . . is an integral part of Vanderbilt's educational program; and despite the Commission's emphasis on social activities in Vanderbilt-sanctioned, owned and managed student housing (the Properties) on its campus, no identifiable non-exempt uses (such as commercial activity) of the chapter houses appear in the record. . . .

> The changes Vanderbilt made beginning in 2001 are substantial, resulting in the national fraternities being removed from Vanderbilt's housing program – along with Vanderbilt assuming substantially more responsibility for control and maintenance, along with potentially heightened liability risks. The use of the Properties was squarely brought into line with Vanderbilt's campus-wide housing program while maintaining the benefits associated with Greek clubs on campus. . . .

> . . . The parties in the 1992 Chancery Court case presented only two options to the Court: a 50% exemption based, in part, on the 1968 consent order or no exemption at all. The question of a 100% exemption was simply not presented to the Court. The 1992 Court found that Vanderbilt was entitled to the educational purposes exemption. The Court agrees with

6

this determination and concludes that the . . . Greek Facility Management Program process that began in 2001 further tied the chapter houses to Vanderbilt's general housing and educational purposes that the Court's duty of liberal construction is obligated to take into account and give appropriate consideration. The Court agrees with Vanderbilt that there is no blanket requirement that a facility being considered for the educational purposes exemption be required to engage in conduct that approximates a system of formal instruction. Here, the Court concludes that the Properties qualify for the 100% exemption because they are occupied and used in ways that are directly incidental to and that are an integral part of Vanderbilt's educational mission.

The SBOE, the Tennessee Assessment Appeals Commission, the Davidson County assessor of property, the Attorney General of Tennessee, and the Metropolitan Government of Nashville and Davidson County (together, the "State") appeal from the trial court's decision.

ANALYSIS

A. Standard of Review

An appeal from the Tennessee Assessment Appeals Commission to the chancery court is reviewable de novo. *Richardson v. Tenn. Assessment Appeals Comm'n*, 828 S.W.2d 403, 406 (Tenn. Ct. App. 1991). The trial court's review is governed by the Uniform Administrative Procedures Act ("APA"), Tenn. Code Ann. § 67-5-212(b)(4), and consists of a new hearing based on the administrative record in addition to any additional evidence either party wants to introduce. Tenn. Code Ann. § 67-5-1511. The APA addresses judicial review of administrative proceedings and provides:

(h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

7

(5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.

(B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Tenn. Code Ann. § 4-5-322(h).

Our review of the chancery court's decision is governed by Rule 13(d) of the Tennessee Rules of Appellate Procedure, which states that we are to review the trial court's findings of fact de novo, with a presumption of correctness, unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Richardson*, 828 S.W.2d at 407. No presumption attaches to the trial court's conclusions of law. *Richardson*, 828 S.W.2d at 407 (citing *Adams v. Dean Roofing Co.*, 715 S.W.2d 341, 343 (Tenn. App. Ct. 1986)).

B. Educational Purpose Exemption

The educational purpose exemption is available for property that an educational institution occupies and uses "purely and exclusively for carrying out one (1) or more of the purposes for which the institution was created or exists." Tenn. Code Ann. § 67-5-212(a). The phrase "purely and exclusively" has been interpreted to mean that property is exempt from property tax if the use is "'directly incidental to or an integral part of' one of the recognized purposes of an exempt institution." *Methodist Hosps. of Memphis v. Assessment Appeals Comm'n*, 669 S.W.2d 305, 307 (Tenn. Ct. App. 1984). In that case, the Court of Appeals affirmed the trial court's determination that property owned by a hospital and used exclusively to provide free parking to individuals employed by and associated with the hospital was entitled to the property tax exemption. *Id.* at 306-07. The Court found that the parking facility was "an essential and integral part of" the hospital where public transportation was unavailable and hospital personnel was required around-the-clock. *Id.* at 307.

The courts have had several opportunities to interpret and apply the property exemption set forth in Tenn. Code Ann. § 67-5-212(a)(1) in cases involving a union headquarters with parking facilities, *LaManna v. Electrical Workers Local Union No. 474*, 518 S.W.2d 348 (Tenn. 1974); a lodge used by the Elks Club, *North Gates Elks Club v. Garner*, 496 S.W.2d 887 (Tenn. 1973); and a religious organization's real property used for a cafeteria, snack bar, and parking lot, *City of Nashville v. State Bd. of Equalization*, 360 S.W.2d 458 (Tenn. 1962), among others. Our Supreme Court has explained that "[t]he real test determinative of [an entity's] tax exempt status is the use it makes of the property." *North Gates Elks Club*, 496 S.W.2d at 889.

8

"[T]he exemption granted by [Tenn. Code. Ann. § 67-5-212(a)(1)(A)] is construed liberally in favor of the religious, charitable, scientific or educational institution." *Christ Church Pentecostal v. Tenn. State Bd. of Equalization*, 428 S.W.3d 800, 807 (Tenn. Ct. App. 2013) (citing *Book Agents of the Methodist Episcopal Church, S. v. State Bd. of Equalization*, 513 S.W.2d 514, 521 (Tenn. 1974)). However, "one claiming such exemption has the burden of showing his right to it." *Book Agents*, 513 S.W.2d at 521. "The purposes of the exemption must be balanced against 'the need for an equitable distribution of the tax burden.'" *Christ Church Pentecostal*, 428 S.W.3d at, 807 (quoting *Middle Tenn. Med. Ctr. v. Assessment Appeals Comm'n*, No. 01A01-9307-CH-00324, 1994 WL 32584, at *2 (Tenn. Ct. App. Feb. 4, 1994), *perm. app. denied* (Tenn. May 9, 1994)).

The trial court relied on the case *George Peabody College for Teachers v. State Board of Equalization*, 407 S.W.2d 443 (Tenn. 1966), for its statement that "university housing may qualify for the educational exemption because it is directly incidental to an integral part of the educational mission of the school." At issue in *Peabody College* was whether apartments and houses owned by George Peabody College for Teachers, a non-profit educational institution, and provided to its graduate students, were exempt from property tax pursuant to the educational exemption that was the precursor to the version of Tenn. Code Ann. § 67-5-212(a)(1) applicable to this case. *Peabody Coll.*, 407 S.W.2d at 443-44. Some, but not all, of these residences were on the Peabody College campus. *Id*. at 444. The apartments were occupied either by unmarried students or married students who shared the housing with their spouses and children. College officials exercised "general supervision" over the apartments and houses, but these residences were not monitored in the same way as the dormitories on the campus. *Id.*

The *Peabody College* Court compared the facts of its case with the facts of an earlier case in which real property owned by a university that was used for growing vegetables to feed the students was found to be exempt from tax pursuant to an earlier version of Tenn. Code Ann. § 67-5-212(a)(1). *Id.* at 445-46; *see State v. Fisk Univ.*, 10 S.W. 284, 285-87 (Tenn. 1889). When the *Peabody College* case was initiated, there was no dormitory exemption in the Tennessee Code. The *Peabody College* Court reasoned that if property used to feed students was exempt from taxation, then property used to house students should also be exempt because "[b]oth uses are directly incidental to, and indeed an integral part of, the educational purpose of educational institutions." *Peabody Coll.*, 407 S.W.2d at 445-46.

While the *Peabody College* case was pending before our Supreme Court, the Tennessee legislature enacted the dormitory exemption. *Id*. at 444-45. The Supreme Court wrote,

It might be appropriate to note here that since the decision of the State Board of Equalization, the Legislature has acted to insure that, in the future,

9

property of the nature here involved will not be taxed, by enactment of the [dormitory] subsection to T.C.A. s 67-502.

*Id*. at 444. Tennessee Code Annotated section 67-502 preceded the current Tenn. Code Ann. § 67-5-213(a) and is substantially unchanged from the current version.[4] Because of the addition of the dormitory exemption to the statutory framework, there is now no need to rely on Tenn. Code Ann. § 67-5-212(a)(1) to exempt student housing from taxation.

The two cases most analogous to the facts here are *City of Memphis v. Alpha Beta Welfare Association*, 126 S.W.2d 323 (Tenn. 1939), and *State v. Rowan*, 106 S.W.2d 861 (Tenn. 1937). *Alpha Beta* involved a local chapter of the Phi Chi Medical Fraternity of Memphis. The members of the fraternity included alumni of the fraternity living in Memphis as well as active members of the University of Tennessee's medical school. *Id*. at 324. Fifty medical students lived in the fraternity and paid a monthly fee. The fraternity was created to "promot[e] and provid[e] for medical and scientific education of young men." *Id*. A witness testified that the "real purpose" of the fraternity was to teach the medical students things they could not learn through their classes, which the witness called "the art of medicine." *Id*. at 325. The older members acted as tutors to the younger members who lived in the fraternity and often gave lectures in the evenings. *Id*. The Court found there was "a system of instruction approximating that of teacher to pupil." *Id*. at 326. The fraternity was only allowed to hold six to eight dances per year, and these were "careful[ly] supervis[ed]." *Id*. The Court found the fraternity was "operated in accordance with the purposes set forth in its charter . . . for the better education of the student members of the Fraternity, and its real property . . . is devoted solely and exclusively to such purposes." *Id*. at 326. Concluding that the fraternity was entitled to the tax exemption set forth in what is now Tenn. Code Ann. § 67-5-212(a)(1), the Court wrote:

> [T]he student members of the Fraternity by reason of being housed together receive medical, ethical, and cultural instruction that they otherwise would not get. The acquisition of the property in order that the students might be housed together was but the means to the end that the purpose of the Phi Chi Medical Fraternity to promote the welfare of medical students morally and scientifically might be more effectively carried out.

*Id*.

---

[4] The pertinent subsection of the earlier version of the statute read:

> The real estate owned or leased by an educational institution and used for dormitory purposes for its students, even though other student activities are conducted therein, and even though the student's spouse or children may reside therein.

*Peabody Coll*., 407 S.W.2d at 444-45.

The other closely analogous case is *State v. Rowan*, 106 S.W.2d 861 (Tenn. 1937), which involved real property owned by the University Club of Memphis. Evidence showed that club was formed "to foster a spirit of fraternity among university and college men, and to incorporate liberal culture and education . . . ." *Id.* at 862. Despite its literary and educational objectives, however, the social and athletic activities at the club predominated over any educational offerings. One of the club's officers admitted that "considerable gambling and drinking transpired at the club," *id.* at 864, and the evidence showed that ten times as much money was spent on athletic activities and entertainment as was spent on educational or charitable activities. *Id.* The court found that due to the comparatively insignificant amount of time and money spent on the educational and literary activities compared with the social and athletic activities, it could only conclude that the educational and literary activities "must be regarded as incidental" to the social and athletic activities. *Id.* The Court held, "While defendant club may be said to be an educational institution in a broad sense, we think it cannot be regarded as an educational institution" for purposes of exempting the club from the obligation to pay property taxes. *Id.*

The State contends that the Fraternity Houses are used more for social purposes, as in *Rowan*, than for educational purposes, as in *Alpha Beta*. One document introduced as an exhibit listed the social events at the Fraternity Houses for the 2008-2009 academic year that were registered with the Office of Greek Life at Vanderbilt. Most of Fraternity Houses at issue hosted at least five registered social events each semester of that year, and one fraternity hosted sixteen social events each semester. Each of these events was scheduled to last for four hours. The number of hours the Fraternity Houses spent hosting these social events dwarfs the number of hours they spent providing educational programs.

Several students testified through depositions about their experiences at the Fraternity Houses. One student who was a member of Sigma Nu testified that he and his friends congregated at the Fraternity House to watch movies and sports. He described it as "the living room for all of us." Each student who gave his deposition testified that alcohol was served at the registered social events, and one student testified that he worked the doors of a party once that "had like 800 people come through." Another student testified that his fraternity hosted one to two parties per weekend unless they were on probation. The students who had been officers of a fraternity and who spent one or more years living at one of the Fraternity Houses testified that they spent some time studying while living there. No testimony was offered, though, that the majority of the nonresident members who spent time at the Fraternity Houses used their time for studying or attending educational programs. Most of the nonresident members went to the Fraternity Houses to "hang out" with their friends, watch movies, play video games, engage in informal basketball or football games, and attend parties. One of the students testified that Lambda Chi Alpha sponsored lectures by a faculty member or outside

individual that took place only once a semester. The same student also testified that Lambda Chi Alpha hosted parties once or twice a week.

Richard Clayton Arrington was the senior director for student programs and organizations within the Office of the Dean of Students at Vanderbilt. He testified regarding educational programs held at the Fraternity Houses as follows:

Q: [A]s we sit here today, you don't have any specific evidence of what lectures went on, the date they went on, the nature of them, or anything like that, do you?

A: I don't have anything specific that I can present to you. I know that there's some - - I don't have any specifics to share with you, other than to tell you that there are - - there are lectures that - - and educational programs that occur in those houses on a fairly frequent basis.

Vanderbilt contends that its policy of requiring all students to live on campus contributes to the students' educational development and is an integral part of a Vanderbilt education. Vanderbilt relies on the *Peabody College* case to argue the trial court was correct in ruling that the Fraternity Houses are exempt because they provide student housing and "are part of and integral to Vanderbilt's educational mission." However, as the *Peabody College* Court pointed out, now that the dormitory exemption is a part of the statutory framework, the question whether student housing is exempt from property taxes depends on whether it qualifies as "dormitory purposes," not whether it is used "purely and exclusively" for educational purposes. Vanderbilt's contention that the Fraternity Houses should be exempt because of their role in providing student housing is properly considered in light of Tenn. Code Ann. § 67-5-213(a), the dormitory exemption, rather than in light of Tenn. Code Ann. § 67-5-212(a), the educational exemption.

The determination of whether the Fraternity Houses are used "purely and exclusively" for educational purposes (other than as student housing) depends on whether they are "directly incidental to or an integral part of one of the recognized purposes of an exempt institution." *Methodist Hospitals of Memphis*, 669 S.W.2d at 307. Like the University Club in *Rowan*, the members of the Fraternity Houses spend far more time socializing than attending educational events. Despite Vanderbilt's insistence that the Fraternity Houses are educational, the record contains no evidence of "a system of instruction approximating that of teacher to pupil" at the Fraternity Houses, as was the case with the medical fraternity in *Alpha Beta*. The use of the Fraternity Houses determines whether they are entitled to the tax exemption, and we conclude the Fraternity Houses are used more for social purposes, as the University Club was used in *Rowan*, than for educational purposes, as the medical fraternity was used in *Alpha Beta*.

12

The fact that Vanderbilt is now in charge of the use and maintenance of the Fraternity Houses does not mean the use of them has changed, and the use is ultimately determinative of whether property qualifies for the educational exemption. Evidence was introduced that the use of the Fraternity Houses by the students has not changed since Vanderbilt implemented the Greek Facility Management Program and replaced the leases it formerly had with the national fraternity organizations with licenses. The trial court's conclusion that Vanderbilt's implementation of the Greek Facility Management Program brought the Fraternity Houses "into line with Vanderbilt's campus-wide housing program," and, thus, entitled them to the educational exemption, was erroneously based on the *Peabody College* decision.

C. Dormitory Exemption

The Assessment Appeals Commission and the trial court both concluded that the Fraternity Houses are not used primarily for dormitory purposes, and, therefore, are not exempt from property taxes pursuant to Tenn. Code Ann. § 67-5-213(a). This statute provides as follows:

> Real estate owned by an educational institution and used primarily for dormitory purposes for its students, even though other student activities are incidentally conducted therein, and even though the student's spouse or children may reside therein, is exempt from taxation.

The statute does not define the term "dormitory purposes," and no cases in Tennessee have interpreted this provision. When a term is not defined, courts give the term its "ordinary and commonly accepted meaning." *Beare Co. v. Tenn. Dep't of Revenue*, 858 S.W.2d 906, 908 (Tenn. 1993); *accord State v. Thompson*, 43 S.W.3d 516, 525 (Tenn. Crim. App. 2000). The online Merriam-Webster Dictionary defines "dormitory" as (1) "a room for sleeping; *especially*: a large room containing numerous beds" and (2) "a residence hall providing rooms for individuals or for groups usually without private baths." MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/dormitory (last visited March 25, 2015) (emphasis in original).

The trial court noted that dormitories usually are designed for use by the people who live there. In its Memorandum and Order, the trial court found the following facts:

> The chapter houses are used for housing up to six officers of the fraternity, as a local on-campus headquarters for the fraternity, and as a gathering place for members of the fraternity who do not live in the chapter house. . . . At Vanderbilt, the fraternity house is routinely used by all members of the fraternity – which greatly exceed the number of officers (6) who actually live there. Here, at the chapter houses there is what amounts to executive housing for the officers of the fraternity at the local campus headquarters of

13

the fraternity. It serves also as a kind of gathering place, clubhouse or community center for members of the fraternity.

Vanderbilt does not contest these findings of fact, but it contends the Fraternity Houses are no different than its traditional dormitories and should be treated no differently for tax purposes. Vanderbilt warns that too much focus has been placed on their role as a "clubhouse." Substantial differences exist, however, when comparing traditional dormitories with the Fraternity Houses. In addition to the findings by the trial court, the evidence showed that members of fraternities regularly schedule "registered parties" at the Fraternity Houses where security is required and alcohol is served. Although evidence was introduced that students hold parties in the dormitories where alcohol may be available, there was no evidence that Vanderbilt provides security for these parties or that they are regularly registered with the university. Another important difference is that nonresident members of the fraternities are required to pay a Greek facility maintenance fee that is in addition to the regular residential fees these students are charged to live in a dormitory. The record does not contain evidence of any dormitory charging nonresident students a similar fee. There is also an important difference regarding how students are selected to live in the Fraternity Houses that does not occur with the dormitories. Residents of the Fraternity Houses are limited to the officers, which means that the fraternities, not Vanderbilt, determine who will live in the Fraternity Houses. In contrast, Vanderbilt decides who will live in the dormitories based on which students apply for particular placements and the spaces available. Finally, as the ALJ found, dormitories have information desks and an onsite presence of university faculty, staff, or other representatives, which the Fraternity Houses do not have.

We affirm the trial court's determination that the Fraternity Houses are not used primarily for "dormitory purposes," as required by Tenn. Code Ann. § 67-5-213(a), and that the Fraternity Houses are not entitled to the dormitory exemption of the tax code.

D. First Amendment Argument

Vanderbilt contends that it "has determined that the on-campus residential experience is part of and integral to the education that it provides." According to Vanderbilt, its "First Amendment right to educational autonomy" will be impaired if we determine that its Fraternity Houses are not entitled to either the educational or the dormitory exemption. This argument has no merit. Vanderbilt bases its argument on the case *Grutter v. Bollinger*, 539 U.S. 306 (2003), which involved a university's decision to consider race in admitting students to its law school. *Grutter*, 539 U.S. at 315-16. A white student challenged the university's consideration of her race in denying her admission, alleging the university discriminated against her on the basis of race in violation of the Fourteenth Amendment to the United States Constitution. *Id.* at 316-17. The Supreme Court of the United States upheld the university's right to consider race and ethnicity in its selection of students because diversity contributed to the university's

14

educational mission. *Id*. at 329. The Court wrote, "The Law School's educational judgment that such diversity is essential to its educational mission is one to which we defer." *Id*. at 328.

Vanderbilt contends that it, like the university in *Grutter*, has a constitutionally protected First Amendment right to determine how it will fulfill its mission to educate its students, and that it has determined that the on-campus residential experience, including life in the Fraternity Houses, is integral to its educational mission.[5] We agree that Vanderbilt has a constitutionally protected First Amendment right to determine how to fulfill its mission to educate its students. The record contains no evidence, however, that the State has interfered with any of Vanderbilt's educational decisions. Vanderbilt's determination that the Fraternity Houses provide a necessary component of its educational mission does not mean that the Fraternity Houses are exempt from taxation, regardless of how Vanderbilt characterizes the importance of the Fraternity Houses.[6]

The use of the Fraternity Houses by the students is the basis for denying Vanderbilt a 100% exemption from the property tax laws. For the reasons discussed above, the Fraternity Houses qualify for neither the educational exemption nor the dormitory purposes exemption. The legislature's decision to exempt property belonging to educational institutions and used for educational or dormitory purposes is not a directive compelling Vanderbilt to incorporate or not incorporate a particular approach to its curriculum or educational mission. It is simply a limitation designed to ensure that the intended benefit of the exemption – educational or dormitory purposes as contemplated by the legislature – goes to the entities that are carrying out the described purposes. Vanderbilt has put forth no evidence that the State has interfered with its First Amendment rights in any respect, and the legal conclusion that neither exemption is available to the Fraternity Houses does not prove such interference.

---

[5] Vanderbilt's argument hinges, in part, on its contention that the Fraternity Houses are "dormitories," which we have concluded is not the case.

[6] Vanderbilt's alternative argument, that denying Vanderbilt's Fraternity Houses the tax exemption is tantamount to interfering with Vanderbilt's "right of freedom of association," is equally unavailing. *Speiser v. Randall*, 357 U.S. 513 (1958), on which Vanderbilt relies for its argument, involved a state's attempt to condition a tax exemption on an individual's execution of an oath. *Id*. at 514. There is no similarity between the facts or principles of *Speiser* and those here.

CONCLUSION

The trial court's decision granting Vanderbilt the educational exemption for its Fraternity Houses is reversed, and the earlier decision by the Assessment Appeals Commission is affirmed. Costs of this appeal shall be taxed to the appellee, Vanderbilt University, for which execution shall issue if necessary.


_____
ANDY D. BENNETT, JUDGE